UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

FRANK PASTURA,                    :    Case No. 1:11-cv-400
                                  :
          Plaintiff,              :    Judge Timothy S. Black
                                  :
vs.                               :
                                  :
CVS CAREMARK,                     :
                                  :
          Defendant.              :

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (Doc. 35)**

This civil action is before the Court on Defendant's Motion for Summary

Judgment (Doc. 35) and the parties' responsive memoranda (Docs. 52, 55, and 58).

## I.    BACKGROUND

This is a civil action for age discrimination, sex discrimination, and retaliation

filed by Frank Pastura, who worked as a pharmacist for Defendant CVS Caremark and its

predecessor SupeRx for over 40 years.  Plaintiff alleges that he was unlawfully

discharged by Defendant as part of a pattern of preference for younger and/or female

colleagues and in retaliation for protected activity in violation of the Age Discrimination

in Employment Act ("ADEA"), Title VII, and the Ohio Civil Rights Act ("OCRA").

Defendant CVS Caremark now moves for summary judgment on all claims.

## II.    STATEMENT OF UNDISPUTED FACTS[1]

**A.    Pastura's Employment with CVS**

1.     CVS is a retail drug store chain with approximately 7,200 stores in over 44 states, the District of Columbia and Puerto Rico.  (Doc. 35-10 at ¶ 1).

2.     Pastura began his employment with CVS' predecessor, SupeRx, in 1970 as a pharmacist.  (Doc. 46 at 68).

3.     CVS acquired SupeRx in 1997/1998.  (*Id.* at 69).

4.     As a CVS pharmacist, Pastura was directly responsible, *inter alia*, for accurately filling prescriptions, including selecting the correct product, counting and  measuring the prescribed drugs, and labeling prescriptions. (*Id.* at 180; Doc. 46-1 at 46).

5.     He was responsible for ensuring compliance with all CVS procedures and federal and state laws, rules and regulations while on his shift.  (Doc. 46 at 180).

6.     These CVS  policies include, in cases of dispensing incidents (errors dispensing prescriptions), promptly notifying the appropriate individuals and making a required report.  (*Id.*)

7.     Pastura admits he was responsible for all prescriptions filled and distributed on his shift, and that he received  training from CVS on its rules and policies, including methods  to ensure accuracy of prescriptions.  (*Id.* at 117, 143-45).

8.     Previously, Pastura reported to Pharmacy Supervisor Steve Hamlett for approximately three years.  (*Id.* at 70, 144-45).

9.     Pastura admits he has no reason to believe Hamlett ever discriminated against him.[2]  (*Id.* at 69).

---

[1] *See* Docs. 36, 53.

[2] According to Plaintiff, this fact is irrelevant as Hamlett was not the decision maker in this case.

**B.  CVS' Policy and Procedures Regarding Pharmacist Dispensing Errors**

10.  CVS' Pharmacy Operations Manual, distributed to all CVS pharmacists, contains CVS' Prescription Refund and Incidents Policy ("Incidents Policy"), which instructs pharmacists on procedure in the event of a dispensing incident.  (*Id.* at 143-44; Doc. 46-1 at 16).

11.  A dispensing incident is defined as "a situation that has been discovered after the patient leaves the pharmacy counter and where one of the following five situations has occurred:"  (1) a different medication is dispensed than the medication prescribed ("wrong drug"); (2) the strength of the drug dispensed is different from the strength prescribed ("wrong strength"); (3) the directions for use on the label are different from those prescribed ("wrong directions"); (4) an allergy alert or interaction alert is ignored (drug utilization review, or "DUR"); (5) incorrect patient name on label or incorrect patient profile ("wrong patient"); (6) dispensing expired medication; and (7) prescription is dispensed to the incorrect patient at the point of sale ("POS").  (Doc. 46-1 at 16).

12.  When a pharmacist discovers a dispensing incident, he is required to notify the Pharmacy Supervisor and report the incident electronically.[3]  (Doc. 46 at 24, 139; Doc. 46-1 at 16).

13.  Failure to report a dispensing incident is a terminable offense.[3]  (Doc. 46 at 24, 139; Doc. 46-1 at 16).

14.  Pastura acknowledges he previously read this policy.  (Doc. 46 at 144; Doc. 46-1 at 16).

**C.  The CVS Pharmacist Monitoring Program**

15.  CVS implemented a Quality Assurance Program ("Program") with the stated goal of minimizing dispensing incidents.  (Doc. 42 at 13-14, 32, 50; Doc. 44 at 14-15).

---

[3] Plaintiff notes that his claim in not based on the fact that his errors were electronically reported.

16.    If a pharmacist accumulates a certain number of reported dispensing incidents during a 32-week look-back period, the Program calls for him to be placed into it with the goal of improving the pharmacist's dispensing accuracy.  (Doc. 42 at 25-26).

17.    Pharmacists' reported dispensing incidents are reviewed each quarter for purposes of determining whether they qualify for the Program.  (Doc. 35-10 at ¶ 6).

18.    The number of dispensing incidents required to qualify for the Program is based upon a standard deviation from the average number of errors committed by pharmacists Company-wide during the prior 32-week period.  (Doc. 44 at 50-51; Doc. 40 at 15).

19.    The Program calls for the Pharmacy Supervisor and pharmacist to initially create an action plan to improve dispensing accuracy.  (Doc. 44 at 73; Doc. 44-1 at 6).

20.    If the pharmacist commits additional errors or otherwise fails to execute on the action plan, the Program calls for him or her to either be escalated to the next stage of the Program (written or final counseling), or terminated at any time.  (Doc. 44 at 86, Doc. 44-1 at 6).

21.    The Implementation Guide for the Program specifically states, in multiple locations, "If at any step the action plan was not executed, then the Pharmacist's employment with CVS will be terminated."[4]  (Doc. 44-1 at 7, 10, 11).

22.    Moreover, if a pharmacist qualifies for enrollment more than two times during a two-year period, his employment is terminated immediately.  (*Id.* at 1).

**D.    Pastura's Dispensing Errors And Enrollment in the Program**

23.    In September 2010, Pastura was placed in the Program after the quarterly review revealed he had six reported dispensing errors over the previous 32-week period.  (Doc. 35-10 at ¶¶ 10-11).

---

[4] Plaintiff notes that he is alleging that his supervisor did not adhere to the requirements of the Program.

24.     Six reported errors qualified a pharmacist for the Program in September 2010.  (Doc. 40 at 18).

25.     Pastura was the only pharmacist supervised by Pharmacy Supervisor Hamlett who qualified for the Program at that time.[5]  (Doc. 35-10 at ¶ 12).

26.     Pastura neither disputes he committed the errors nor that they were reported.[6]  (Doc. 46 at 123-24, 139-43).

27.     Pastura did not believe his initial placement in the Program by Hamlett was discriminatory.[5]  (*Id*. at 18, 69).

28.     Hamlett, however, failed to develop an action plan with Plaintiff.  (*Id*. at 42).

29.     In October or November 2010, Rudell transitioned into Pastura's District  as the new Pharmacy Supervisor.  (*Id*. at 41).

30.     When Rudell took over her full duties as Pharmacy Supervisor, she was uncomfortable removing Pastura from the Program because there was no evidence he had executed on any action plan.[7]  (Doc. 47 at 85-88).

31.     During the time Pastura was a participant in the Program, it was administered by Kevin Masci.  (Doc. 42 at 26).

32.     Accordingly, Rudell conveyed her concerns to Masci by email on December 1, 2010.[7]  (Doc. 35-14 at ¶¶ 6-7, Ex. A).

33.     Rudell noted she had met with Pastura that day, and because he had not completed an action plan with Hamlett, she and Pastura had completed an action plan together.[7]  (*Id*. at ¶ 6, Ex. A).

---

[5] According to Plaintiff, this fact is irrelevant as Hamlett was not the decision maker and did not identify Plaintiff for the monitoring program.  (Doc. 44 at 50-51; Doc. 47 at 68, 69).

[6] According to Plaintiff, this fact is irrelevant and he had no notice of the errors at the time they were reported and could not reasonably dispute them.  (Doc. 41 at 88-89, 103-04).

[7] Plaintiff alleges it was Hamlett's responsibility to draft an action plan, not his.

34.    Rudell also noted that Pastura had not reported POS errors (errors where the technician provided a prescription to the wrong customer) the prior week, and had stated he was unaware such errors needed to be reported.[8]  (*Id.*)

35.    While POS errors are not counted against a pharmacist for purposes of qualification for the Program or other disciplinary purposes, pharmacists must nonetheless report them in the same manner as other dispensing errors.[8]  (Doc. 44 at 46-47; Doc. 42 at 17; Doc. 35-10 at ¶ 3).

36.    Masci told Rudell that while Pastura had not had any "new"errors reported, he would still qualify for inclusion in the Program in December 2010, because he had accumulated 14 reported dispensing errors since May 2010, the 32-week look back period.[9]  (Doc. 35-14 at ¶ 6, Ex. A).

37.    The number of errors required to qualify for the Program in December 2010 was seven.  (Doc. 40 at 18-19).

38.    Because the computer system automatically closed Pastura's participation in the Program after Rudell added information regarding their 60-day meeting, Masci added Pastura back to the Program.  (Doc. 35-16 at ¶ 7).

39.    As Hamlett had not completed an action plan with Pastura, Masci and Rudell considered the reenrollment a simple continuation of Pastura's first enrollment period in the Program, as opposed to a second, independent period.  (Doc. 35-16 at ¶ 8; Doc. 47 at 92).

**E.    Pastura Meets With Rudell To Complete A Second Action Plan**

40.    On December 21, 2010, Rudell met with Pastura to complete another action plan and, as Masci described in his email to Rudell of December 2, 2010,

---

[8] According to Plaintiff, this fact is irrelevant insofar as it was not a factor in his termination.

[9] Plaintiff disputes that these errors actually motivated termination as they included errors for which he had already been placed on the monitoring plan which he successfully completed. (Doc. 42-1 at 1).

"start from scratch."[10]  (Doc. 47 at 42-43, 90, 92; Doc. 47-1 at 4; Doc. 35-14 at ¶ 12, Ex. A).

41.     Pastura was resistant to another action plan.  (Doc. 46 at 35).

42.     Pastura alleges he told Rudell the second action plan was "unfair" and "discriminatory"and refused to sign it.  (*Id.*)

43.     Pastura admits he never raised any issue with regard to his age or sex, compared his treatment with that of  anyone else, or otherwise indicated why he believed the action plan was unfair or discriminatory.[11]  (*Id.* at 35, 177).

## F.     Pastura Meets with Rudell and Scarth

44.     Pastura alleges he had a meeting with Randy Scarth, District Manager, and Rudell approximately a week later.  (*Id.* at 80-81).

45.     During that meeting, Pastura alleges Scarth questioned him about the second action plan and asked, "What is the big deal? Why don't you want to sign the paper?"  (*Id.* at 81).

46.     According to Pastura, he responded that he felt harassed, picked on, and treated differently.  (*Id.* at 164-66).

47.     Again, however, Pastura admits that he never raised any issue with regard to his age or sex, compared his treatment with that of anyone else, or otherwise provided any indication why he felt he was treated unfairly or treated differently.[11]  (*Id.* at 165-66, 176-78).

48.     He alleges Scarth responded that the store had  a new store manager and  a new Pharmacist in Charge ("PIC"), and Pastura was "the only link to the past."  (*Id.* at 81).

---

[10] Plaintiff alleges this second action plan was unnecessary and improper because he did not have six errors between the end of his first monitoring and December 21, 2010.  (Doc. 42-1 at 1).

[11] According to Plaintiff, this fact is irrelevant.

49.     He alleges Scarth continued, "You are either going to have to get with the program, resign, or be terminated." (*Id.*)

50.     When Pastura said he was not going to resign, he alleges Scarth replied, "Well, if you want to know the truth, I just feel like you have been sliding by for the past 10 years." (*Id.*)

51.     Pastura admits Scarth never referenced his age and he simply assumed Scarth was referring to his age.[12] (*Id.* at 83-86).

52.     Pastura admits he understood Scarth's "sliding by"comment as "Well, you may have been okay as a performer at one time, but, you know, you just have been getting by with it the past 10 years."[12] (*Id.* at 84-85).

53.     With regard to Scarth's alleged comment regarding Pastura being "the only link to the past," Pastura candidly admits, "That doesn't relate to my age, but it surely does relate to the fact that there might have been a mission there to just clean house."[12] (*Id.* at 85).

## G.     Pastura is Issued an Action Plan for Pharmacy Metrics Within His Scope of Responsibility

54.     In December 2010/January 2011, Rudell noted several of Store 6093's pharmacy performance metrics were consistently falling below an acceptable level.[13] (Doc. 47 at 139-41).

55.     In addition, on December 20, 2010, Valerie Culp, who had taken over as PIC at Store 6093 in June 2010, emailed Rudell regarding ongoing concerns Culp had with the store, including the store's pharmacy metrics.[13] (Doc. 47 at Ex. 2; Doc. 41 at 70-71; Doc. 41-1 at 1).

56.     Because (1) the pharmacists (typically two full-time pharmacists per store) share responsibility for the store's metrics; (2) Rudell did not have regular monthly meetings with Pastura as she did with the PIC; and (3) Pastura had been at the store far longer than Culp, Rudell met with Pastura on or about January 21, 2011 and issued him an action plan requiring him to provide her

---

[12] According to Plaintiff, this fact is irrelevant.

[13] Plaintiff denies responsibility for the metrics as Culp was the PIC. (Doc. 48 at 58-59).

a detailed account of what changes he felt needed to occur to ensure those the store's metrics would improve.[14]  (Doc. 46 at 156-58; Doc. 46-1 at 24; Doc. 47 at 154-56; Doc. 47-1 at 2; Doc. 35-14 at ¶ 15).

57.  The action plan noted if substantial improvement were not achieved, further options, up to and including termination, would be discussed.[14]  (Doc. 46-1 at 24).

58.  Pastura's performance (and the store's performance) in those areas improved following issuance of that action plan.[15]  (Doc. 47 at 70, 158-59).

## H. Pastura's Dispensing Errors Continue and His Employment is Terminated

59.  Following issuance of the December 21, 2010 action plan, Pastura continued to make dispensing errors, which were ultimately reported to Rudell.[16]  (Doc. 47 at 39-40; Doc. 42 at 18-22; Doc. 42-1 at 1; Doc. 40 at 9-10, 22-23).

60.  In just six days (February 3-9, 2011), Pastura had three reported dispensing errors.[16]  (Doc. 47 at 39-40; Doc. 42 at 18-22; Doc. 42-1 at 1; Doc. 40 at 9-10, 22-23).

61.  Accordingly, Rudell consulted with CVS' Human Resources Manager regarding whether Pastura's discharge was appropriate given his continued dispensing errors.[17]  (Doc. 47 at 69-70).

62.  After concluding his discharge was appropriate to protect CVS' customers, Rudell scheduled a meeting with Pastura on February 21, 2011.[16]  (Doc. 47 at 69, 108).

63.  In the interim, on February 18, Rudell received a report from pharmacy

[14]  Plaintiff denies responsibility for the metrics as Culp was the PIC.  (Doc. 48 at 58-59).

[15]  According to Plaintiff, this fact is irrelevant for purposes of Defendant's motion.

[16]  Plaintiff denies that these errors motivated his termination insofar as Rudell failed to follow CVS requirements for written warnings.  (Doc. 52-2 at ¶ 4, 5; Doc. 44 at 71-72, 74, 92-94, 96; Doc. 44-1 at 17; Doc. 44-2 at 10; Doc. 49 at 42, 46, 47; Doc. 49-1 at 9).

[17]  Plaintiff alleges that Rudell ignored Masci's concern that she failed to follow CVS's monitoring policy regarding written warnings.  (Doc. 52-2 at ¶ 4, 5; Doc. 44 at 71-72, 74, 92-93, 96; Doc. 44-1 at 17; Doc. 44-2 at 10; Doc. 49 at 42, 47; Doc. 49-1 at 9).

technician Staci Taylor reporting that Pastura had, on several occasions, left private health information on patients' answering machines and/or with other members of their household in violation of HIPAA and CVS policy.[18] (*Id.* at 135-36; Doc. 47-1 at 1).

64.    Taylor raised the complaint with regard to Pastura; Rudell requested she reduce it to writing for record-keeping purposes.  (*Id.* at 135-36).

65.    Because Rudell had already decided to terminate Pastura's employment due to his dispensing errors, he was not written up or disciplined for his violation.[18]

66.    Pastura's son unexpectedly passed away on February 20th, and Pastura took two weeks leave for the same.  (Doc. 46 at 61, 103-04, 181).

67.    Rudell permitted Pastura to work for a week following his return from leave.  (Doc. 47 at 106).

68.    However, Pastura had another reported dispensing error that week, issuing a customer two prescriptions for her diabetes medication, one name brand and one generic, despite warnings in the pharmacy's  computer system  that she  had  already  been  issued  a prescription.[19]  (Doc. 41 at 150-52; Doc. 47 at 92-99).

69.    The customer's daughter came into the store very  upset, complained to Culp regarding the error, and said she "wanted someone's job over it."[19] (Doc. 41 at 150-52).

70.    Culp immediately reported the error to Rudell.[19]  (*Id.* at 150-52)

71.    Rudell concluded she could wait no longer to discharge him, as Pastura's error with the diabetes medicine was the second error reported that day (March 11), and his fifth since his  30-day meeting with Rudell following issuance of his second action plan.[19]  (Doc. 47 at 106; Doc. 35-14 at ¶ 24;

---

[18] According to Plaintiff, this fact is irrelevant for purposes of Defendant's motion as it occurred after the decision to terminate and Plaintiff denies Taylor's claim.

[19] According to Plaintiff, this fact is irrelevant for purposes of Defendant's motion as it occurred after the decision to terminate.

-10-

Doc. 42-1 at 1).

72.   In approximately 10 months, Pastura had accumulated 17 reported errors.[20] (Doc. 42-1 at 1).

73.   CVS received another seven reported errors following Pastura's termination that had not yet been discovered during his employment.[20]  (Doc. 42 at Ex. 1).

74.   Rudell met with Pastura on March 14 and told him CVS was terminating his employment due to his numerous and continuing dispensing errors.  (Doc. 46 at 100).

75.   Rudell made the ultimate decision to terminate Pastura, not Scarth, Culp or anyone else.  (Doc. 47 at 52, 68, 107; Doc. 48 at 40-41).

76.   Pastura alleges because several "senior  pharmacists" either resigned or were terminated  within approximately 18 months of his deposition, his termination, and his continued participation in the Program and written action plan for pharmacy metrics must have been motivated by age-based animus.[21]  (Doc. 46 at 43, 48; Doc. 46-2 at 5, 8).

77.   At deposition, Pastura submitted a list of 13 such pharmacists, but admitted he had no first-hand knowledge of the circumstances of any of their terminations or resignations, and his list was simply the product of sitting down with a couple of former pharmacists over a sandwich and a beer and listing other pharmacists who had left CVS.[21]  (Doc. 46 at 43-48; Dock 46-2 at 5).

78.   Five of the identified individuals were never supervised by Rudell, the decision maker in his case.[21]  (Doc. 47 at 128-31).

79.   Four of the identified individuals were not supervised by Rudell at the time they were discharged or resigned.[21]  (Id. at 131-32).

---

[20]   According to Plaintiff, this fact is irrelevant for purposes of Defendant's motion as it occurred after the decision to terminate.

[21]  According to Plaintiff, this fact is irrelevant.

80. The remaining four identified individuals either voluntarily resigned or were terminated for completely different reasons than Pastura.[22] (Doc. 47 at 118-19, 121-22, 124; Doc. 35-14 at ¶ 25).

81. Wayne Alverson resigned in lieu of termination for sleeping on the job.[22] (Doc. 47 at 118-19).

82. Herman Groshoff voluntarily resigned his employment. (*Id.* at 124).[22]

83. Miriam Michaels was terminated for unsatisfactory performance with regard to customer service.[22] (Doc. 35-14 ¶ 25).

## III.  STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex, supra*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson, supra*, 477 U.S. at 248. It is not sufficient

---

[22] According to Plaintiff, this fact is irrelevant.

for the nonmoving party to merely "show that there is some metaphysical doubt as to the material facts." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Matsushita, supra*, 475 U.S. at 586). Instead, the nonmoving party must show that "the evidence presents a sufficient disagreement to require submission to a jury." *Griffin v. Hardrick,* 604 F.3d 949, 953 (6th Cir. 2010) (citing *Anderson, supra*, 477 U.S. at 252-52).

## IV.    ANALYSIS

Defendant seeks summary judgment on the basis that Plaintiff's claims of retaliation, age discrimination, and sex discrimination fail for lack of proof.

## A.    Age Discrimination (Counts I and II)[23]

The ultimate question in an age discrimination claim under the ADEA is whether age was a determining or motivating factor in the adverse employment action in question. *Gross v. FBL Fin. Servs.*, 129 S.Ct. 2343, 2351 n.4 (2009). According to *Gross*, there "is no heightened evidentiary requirement for ADEA plaintiffs to satisfy their burden of persuasion that age was the 'but-for' cause of their employer's adverse action[.]" *Id.* Age discrimination claims under the ADEA are therefore evaluated under the circumstantial or indirect evidence approach using the burden-shifting analysis set forth

---

[23] Plaintiff asserts age and gender discrimination claims under both Ohio and federal law. The same evidentiary framework applies to discrimination claims brought under the federal statutes and discrimination claims brought under Ohio state law. *Allen v. Ethicon, Inc.*, 919 F. Supp. 1093, 1098 (S.D. Ohio 1996); *see Barker v. Scovill, Inc.*, 451 N.E.2d 807, 809 (Ohio 1983) (citing *Plumbers & Steamfitters Comm. v. Ohio Civ. Rights Comm'n*, 421 N.E.2d 128 (Ohio 1981)).

in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

To establish a *prima facie* case of discrimination through circumstantial evidence, Plaintiff must show that (1) he was a member of a protected class; (2) he was qualified for the job he held; (3) he suffered an adverse employment action; and (4) he was replaced by someone outside the protected class or treated differently than similarly situated employees outside the protected class. Once a *prima facie* case has been established, the Defendant must rebut it with a legitimate, nondiscriminatory reason for Plaintiff's dismissal. Finally, the burden shifts back to the Plaintiff to show that the reason offered is a pretext for age discrimination. *McDonnell Douglas*, 411 U.S. at 802; *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308 (1996); *Barnett v. Dep't of Veterans Affairs*, 153 F.3d 338, 341 (6th Cir. 1998); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998).

### 1.    *Prima Facie* **Case**

Defendant's motion largely focuses on its assertion that Plaintiff has failed to adequately demonstrate that Defendant's stated nondiscriminatory reason for dismissing him is pretextual, and makes little effort to contest the existence of a *prima facie* case of age discrimination. Pastura qualifies as a member of a protected class for purposes of the ADEA. His termination is unquestionably an adverse employment action. Finally, Pastura was ultimately replaced by 27-year-old Alana Dreiling, a significantly younger

pharmacist. (Doc. 52 at 12). Additionally, 31-year-old Valerie Culp, the other pharmacist who worked in Plaintiff's store, was not issued the same kind of action plan designed to address deficiencies in the store's metrics that was given to Plaintiff. (Doc. 35-1 at 7). Culp also has a record of other misconduct that a jury could conclude should have resulted in more serious repercussions, but did not. (Doc. 41 at 48, 52-53). Plaintiff has therefore also demonstrated a question of fact as to whether these differences were appropriate or Plaintiff was being treated differently than similarly situated employees outside the protected class. The only element of the prima facie case that Defendant appears to dispute is whether Plaintiff was qualified for his position, and it does so only nominally. (Doc. 35-1 at 10).

In order to establish the second element of a *prima facie* case, Plaintiff need only demonstrate that he was objectively qualified for the position. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574-76 (6th Cir. 2003) (en banc); *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 1999). Courts in the Sixth Circuit are not to use the defendant's articulated nondiscriminatory reason for termination to assess whether the plaintiff was qualified for the position, and, instead, must evaluate the qualifications of the plaintiff independent of it. *Wexler*, 217 F.3d at 574-75; *Cline*, 206 F.3d at 660-61. Outside of the record of dispensing errors that Defendant alleges Pastura's termination was predicated on, there is no evidence whatsoever that Plaintiff was not qualified for the position of staff pharmacist.

Plaintiff has established all the elements necessary to make up a *prima facie* case of age discrimination.

### 2.    Pretext

In response to Plaintiff's claim of age discrimination, Defendant has put forward Plaintiff's record of dispensing errors as a legitimate, non-discriminatory reason for his termination.  Over the course of 10 months, Plaintiff accumulated 17 reported errors.  (Doc. 42-1 at 1).  Indeed, no other pharmacist under Pharmacy Supervisor Rudell's supervision had accumulated as many reported errors as quickly.  (Doc. 35-14 at ¶ 10; Doc. 35-15 at ¶ 6).  As such, Defendant has clearly put forward a legitimate, nondiscriminatory reason for Plaintiff's termination, and to survive the motion for summary judgment, Plaintiff must demonstrate a question of fact as to whether this stated reason was nonetheless a pretext for age discrimination.

To establish that Defendant's explanation for his termination is unworthy of belief, Plaintiff may show that it had no basis in fact, did not actually motivate it, or was insufficient to motivate the termination decision.  *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).  Here, Plaintiff has successfully established a question of fact as to whether his record of dispensing errors actually motivated his termination.  Plaintiff has pointed to an array of evidence that, when taken as a whole, establishes a question of fact as to the motivations of Plaintiff's supervisors prior to and at the time of his termination and would allow a reasonable jury to conclude

-16-

that he was actually terminated for discriminatory reasons.

First, Plaintiff has established that after being placed into the Program, he was not provided with a required action plan by his Pharmacy Supervisor that would have allowed him to exit the program after his completion of 60 error-free days, and instead was forced to re-enroll in the Program for another 60 days in order to complete one. (Doc. 46 at 28, 42). Despite Defendant's insistence that Plaintiff was terminated in the name of patient safety, during the intentionally-extended course of his enrollment in the Program, Plaintiff was not issued any warnings or notified of his alleged errors, even when he asked for such notice. (Doc. 52 at 20). As notifying a pharmacist of his mistakes immediately would logically be the best way to prevent them from being repeated, a reasonable jury could conclude that this failure suggests that patient safety was not truly the motivating factor behind the actions of Plaintiff's supervisors.

Additionally, 14 of the 17 errors that Defendant claims motivated Plaintiff's termination were reported before Plaintiff was ever placed into the Program or notified of any errors. (Doc. 42-1 at 1). At least four of the errors that Defendant relies on were not reported until after the decision was made to terminate Plaintiff. (Doc. 52 at 22). Rudell requested that Taylor put her claim that Plaintiff violated HIPAA in writing after Rudell had already decided to terminate Plaintiff. (*Id.*) Masci raised possible discrimination concerns regarding insufficient supporting documentation when he was informed of the plan to terminate Plaintiff. (*Id.*) All of this together raises a legitimate question of fact as

-17-

to the veracity of Defendant's stated reason for termination and could allow a reasonable jury to conclude that in fact the actions of Plaintiff's supervisors were motivated by a desire to collect enough evidence to justify a termination that was, in reality, motivated by age discrimination.

Finally, a number of comments were made to Plaintiff and about his replacement that a reasonable jury could conclude betray a desire on the part of Defendant to replace older pharmacists in Defendant's stores with a new generation of younger pharmacists. In meetings prior to his termination, Plaintiff was told by District Manager Scarth that Plaintiff was "the only link to the past," that he was "either going to have to get with the program, resign, or be terminated," and that Scarth felt Plaintiff had "been sliding by for the past 10 years." These comments are particularly suspicious considering Scarth had only been District Manager for six months, and admittedly did not know what Pastura's performance had been before that. (Doc. 52 at 9). Finally, according to Culp, it took a while for Defendant to replace Pastura because it was waiting for a "fresh crop" of pharmacists to graduate from pharmacy school in order to fill his position. (Doc. 41 at 36-37). A question of fact exists as to whether these statements are evidence of a discriminatory motive and consequently whether Defendant's stated reason for Plaintiff's termination is, in fact, a pretext for age discrimination.

Accordingly, Defendant's Motion for Summary Judgment is **DENIED** with respect to Count I and Count II.

-18-

**B.    Sex Discrimination (Counts III and IV)[24]**

As this Court has already noted in *Nilles v. Givaudan Flavors Corp.*, 2012 WL 1537613 (S.D.Ohio, May 01, 2012) (Black, J.), the Sixth Circuit has modified the *prima facie* case for instances where, as here, a Title VII plaintiff claims reverse discrimination as a member of a demographic majority.[25] *Treadwell v. Am. Airlines, Inc.*, No. 10-5809, 2011 U.S. App. LEXIS 23348, at *4 (6th Cir. Nov. 18, 2011). To establish a *prima facie* case of reverse gender discrimination, a plaintiff must show: (1) background circumstances to support the suspicion that defendant is that unusual employer who discriminates against the majority; (2) evidence that similarly situated employees were treated differently. *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 255 (6th Cir. 2002). The plaintiff can meet this burden by showing that the defendant relied on unlawful consideration of protected characteristics in the past. *Sutherland v. Michigan Dept. of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003).

Plaintiff fails to present any evidence which supports a suspicion that Defendant is the rare employer who discriminates against the majority and thus has failed to satisfy his *prima facie* case for gender discrimination. Accordingly, Defendant's Motion for Summary Judgment is **GRANTED** with respect to Count III and Count IV.

---

[24] A claim for gender discrimination under both Ohio and federal law is analyzed under the same framework. *Thompson v. UHHS Richmond Heights Hosp., Inc.*, 372 Fed. Appx. 620 (6th Cir. 2010).

[25] Plaintiff is a male and therefore is not a member of any category protected by Title VII. *See* 42 U.S.C. § 2000e-2(a)(1).

**C.      Retaliation (Counts V and VI)**[26]

Plaintiff bases his retaliation claims on circumstantial evidence and therefore they also must be analyzed under the standard laid out in *McDonnell Douglas,* 411 U.S. at 792. In order to make out a *prima facie* case, Plaintiff must prove that 1) he engaged in protected activity; 2) Defendant knew about his protected activity; 3) Defendant took an adverse employment action against him; and 3) there was a causal connection between his protected activity and the adverse employment action. *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491-92 (6th Cir. 2010). If Plaintiff meets this burden, Defendant must provide a legitimate, nondiscriminatory reason for its action. *Id.* at 492. If Defendant is able to do so, Plaintiff must then prove that Defendant's "proffered reason was not the true reason for the employment decision" but instead was a pretext for discrimination. *Tuttle v. Metro Gov't of Nashville*, 474 F.3d 307, 320 (6th Cir. 2007) (citation omitted).

Here, Plaintiff's retaliation claims fail because he is unable to establish a genuine issue of material fact with regard to the first prong of a *prima facie* case of retaliation, whether he engaged in a protected activity. Vague charges that management is out to get the plaintiff are not opposition to an unlawful employment practice and do not constitute protected activity. *Fox v. Eagle Distrib. Co.,* 510 F.3d 587, 591 (6th Cir. 2007).

---

[26] Plaintiff claims that Defendant terminated his employment because of his protected activity in violation of Title VII (Count V) and Ohio Revised Code Chapter 4112 (Count VI). State and federal retaliation claims can be considered together - state law claims survive or fail with federal claims. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001).

"Complaints concerning unfair treatment in general which do not *specifically* address discrimination are insufficient to constitute protected activity." *Weaver v. Ohio State University*, 71 F. Supp. 2d 789, 793-94 (S.D. Ohio 1998).  "[A]n employee may not invoke the protections of the Act by making a vague charge of discrimination." *Blizzard v. Marion Technical College*, 2012 WL 504054, at *8 (6th Cir. Oct. 19, 2012).  *See also McKinley v. Skyline Chili, Inc.*, 2012 WL 3527222, at *9 (S.D. Ohio Aug. 14, 2012) (Statements that plaintiff "felt discriminated against" even when coupled with allegation that "all of [her] team members were significantly younger and some [were] male" were too vague to constitute protected activity).

Plaintiff bases his retaliation claims on complaints he alleges he made during two meetings: one with Rudell on December 21, 2010 when she asked him to sign a second action plan, and one with Rudell and Scarth approximately a week later.  (Doc. 46 at 164-66, 176-78, Ex. 12).  Plaintiff alleges that at the first meeting, he claimed that the second action plan was "unfair" and "discriminatory" and refused to sign it.  (*Id.* at 35).  Plaintiff alleges that at the second meeting, he complained that he felt harassed, picked on, and treated differently.  (*Id.* at 164-66).  Based on the undisputed facts, Plaintiff raised only vague protests that he was being treated unfairly and made no reference whatsoever to any violation of his legal rights.

Accordingly, Defendant's Motion for Summary Judgment is **GRANTED** with respect to Count V and Count VI.

-21-

## V.    CONCLUSION

For the reasons stated, Defendant's Motion for Summary Judgment (Doc. 35) is

**GRANTED IN PART AND DENIED IN PART**.  Specifically:

1.    Defendant's Motion for Summary Judgment on Counts I and II
      (age discrimination) is **DENIED**.

2.    Defendant's Motion for Summary Judgment on Counts III and IV
      (gender discrimination) is **GRANTED**.

3.    Defendant's Motion for Summary Judgment on Counts V and VI
      (retaliation) is **GRANTED**.

   **IT IS SO ORDERED.**

Date:  12/31/12                               *s/ Timothy S. Black*
                                        Timothy S. Black
                                        United States District Judge

-22-